## STATE OF CONNECTICUT *v.* RHONDELL BONNER
### (SC 17628)

Norcott, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued October 15, 2008—officially released February 24, 2009

*Christopher Y. Duby*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Rhondell Bonner, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder as a principal or accessory in violation of General Statutes §§ 53a-54a and 53a-8, one count of carrying a pistol without a permit in violation of General Statutes § 29-35 and one count of criminal possession of a pistol in violation of General Statutes § 53a-217c. The defendant claims that the trial court improperly (1) denied his motion to dismiss for lack of a speedy trial, (2) denied him his constitutional right to be present at all critical stages of the prosecution because he was not present at various discussions regarding potential conflicts of interest involving the office of the public defender, and (3) admitted the murder weapon and testimony relating to its chain of possession over the defendant's objections on grounds of relevance, prejudice and hearsay. We affirm the judgment of the trial court.

A jury reasonably could have found the following facts. On the night of December 28, 2002, the defendant, his uncle, Calvin King, and four young women were loitering in the lobby of an apartment building located at 37 Cabot Street in Hartford. Several witnesses had observed the defendant and King openly displaying semiautomatic handguns. One of the apartment's resi-

dents, Annabelle Trimmier, who was well acquainted with the defendant, was disturbed by the noisy crowd in her lobby and ordered the group to leave the building, whereupon they left and began loitering in front of the building.

At approximately 1 a.m. on December 29, 2002, a car operated by the victim, Scott Houle, pulled up to the curb near 41 Cabot Street, where the defendant and King were standing. The victim apparently was seeking to purchase crack cocaine. Moments after the defendant and King approached the victim's car to consummate the transaction, one of the young women, Brittaney Simpson, heard the defendant exclaim, "he's trying to play me," as the victim attempted to drive off without paying for the drugs. At the same time, the defendant and King began firing their handguns rapidly in the direction of the victim's vehicle, riddling it with bullets. The vehicle rolled across the street, over the curb, and came to rest after hitting a fence. The defendant and King fled the scene.

Upon reaching the scene, Hartford police found the victim slumped over in the driver's seat of his car. There were numerous bullet holes in the vehicle, and the rear window had been shattered. The victim had been shot seven times and was pronounced dead at the scene. The medical examiner determined that the victim's death was caused by gunshot wounds to the head and chest, and that it was a homicide.

An investigation of the incident led to the defendant's arrest on March 28, 2003. He subsequently was charged with murder as a principal or accessory, conspiracy to commit murder, carrying a pistol without a permit and criminal possession of a pistol. The defendant was arraigned on March 31, 2003, and bond was set at $1 million. Following a hearing conducted on May 12 and 15, 2003, the court found probable cause to believe that

the defendant had committed the offenses with which he had been charged. After various proceedings and delays lasting more than two years, the defendant's trial commenced on November 1, 2005. On November 11, 2005, the jury returned a verdict, finding the defendant guilty on all counts except the conspiracy count. On January 19, 2006, the defendant was sentenced to a total effective sentence of fifty-five years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

The defendant raises three distinct issues on appeal. We will address each issue separately.

I

The defendant first claims that the trial court improperly denied his motion to dismiss for lack of a speedy trial, in violation of his rights under the federal and state constitutions.[1] The state argues that the court's denial of the defendant's motion to dismiss was proper

---

[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

The sixth amendment right to a speedy trial is made applicable to the states through the due process clause of the fourteenth amendment. See *Klopfer* v. *North Carolina*, 386 U.S. 213, 222–23, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967).

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial . . . ."

The defendant essentially claims that the trial court's allegedly improper application of the rules of practice, implemented pursuant to the statutory mandate of General Statutes § 54-82m, violated his constitutional right to a speedy trial. The defendant does not challenge, however, the constitutionality of the speedy trial scheme embodied in the rules of practice. Indeed, he insists that his constitutional right was violated precisely *because* the rules of practice were not followed, essentially equating the procedures and time limits set under the rules with what is required under the constitution. Because we find that the court complied with § 54-82m and the rules of practice, we need not address the defendant's constitutional claim separately.

because his speedy trial motion was premature. We conclude that the trial court properly declined to dismiss the case on speedy trial grounds.

The record discloses the following additional facts that are relevant to this issue. On October 22, 2004, the defendant filed a motion for a speedy trial pursuant to Practice Book § 43-39 et seq.[2] The court held a hearing on the defendant's motion on October 27, 2004. At the hearing, the following colloquy occurred:

"The Court: All right. Will you assist the court, [Attorney Matthew D.] Goetz,[3] on the computations?

"[Attorney] Goetz: Certainly, Your Honor. . . . Notwithstanding the arrest date of March of 2003, Your Honor, this matter has been considered [on] excludable time pursuant to [statute] and the [rules of practice]. Since approximately the end of July of 2003, it's been

---

[2] Practice Book § 43-39 (d) provides in relevant part: "The trial of [a] defendant shall commence within eight months from the filing of the information or from the date of the arrest, whichever is later, if . . .

"(1) the defendant has been continuously incarcerated in a correctional institution of this state pending trial for such offense . . . ."

Practice Book § 43-40 specifies various periods of time that are excluded in computing the time within which the trial must begin, including "the time between the commencement of the hearing on any pretrial motion and the issuance of a ruling on such motion"; Practice Book § 43-40 (1) (D); "[a] reasonable period of delay when the defendant has been joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted"; Practice Book § 43-40 (4); and "[t]he period of delay resulting from a continuance granted by the judicial authority at the personal request of the defendant." Practice Book § 43-40 (7).

Practice Book § 43-41 provides in relevant part: "If the defendant is not brought to trial within the applicable time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period. For the purpose of this section, good cause consists of any one of the reasons for delay set forth in Section 43-40. . . ."

[3] Goetz was the criminal caseflow coordinator for the judicial district of Hartford at all relevant times.

a [sic] pretrial status up and until today, which [sic] the motion was filed October 22 of this year, and the defendant has excludable time status since that time, since July of 2003."

Given an opportunity to respond, defense counsel made the following statement: "I was not involved in this case until some time in the spring. So I can't speak to some of the time that has transpired. . . . I have to be honest with the court, and I think [the defendant] will understand, as I did need time to review the file, [conduct] discovery, talk to [the defendant] and continue to conduct investigation." The court ruled that, "based on the representations of [Attorney] Goetz . . . [a]nd based on [defense counsel's] not refuting any of that . . . [the defendant is] not entitled to a speedy trial [at this time]. . . . [T]he motion is denied."

The trial court addressed its reasons for denying the defendant's motion for a speedy trial on several subsequent occasions. On December 3, 2004, the court held a hearing in which it continued the defendant's case until January 19, 2005, pending the probable cause hearing of King, a potential codefendant. At the close of that hearing, the following colloquy occurred:

"The Court: Anything else, [defense counsel]?

"[Defense Counsel]: Just, Your Honor, to make clear that none of this time counts against his speedy trial time.

"[Assistant State's Attorney]: Just want to be clear from today's date, all prior time has been excludable but from today's date until January 19 [2005].

"The Court: All right. Starting today, including today, it is not excludable for purposes of [any] speedy trial motion."

At the January 19, 2005 hearing, the defendant himself asked the trial court why his speedy trial motion of October 22, 2004, was denied. The following colloquy occurred:

"The Court: I went over that last time with you.

"The Defendant: You never went over that with me.

"The Court: I did. I did. I recall. The record will show that I did. It wasn't ripe yet. There was a lot of excludable time. . . . I don't know when you're going to—you may want to file a new one. That's up to you. I don't know if it's ripe yet.[4]

"The Defendant: What's the point of filing a new one if I don't have enough time. Out of twenty-two months, you mean to tell me I don't have eight months in to file a speedy trial motion?

"The Court: A lot of . . . this time is excludable for a lot of reasons . . . [w]hich means it doesn't count against the running of the clock."

Later in the same hearing, the assistant state's attorney sought to clarify the record with respect to the excludable time:

"[Assistant State's Attorney]: . . . [I]t's the state's position that, up until the last court date, which was December 30, 2004,[5] all of that—it's the state's position that it's all excludable time for discovery for the defense, for investigation by the defense, for switch-

---

[4] We are not persuaded by the defendant's argument that the court's use of the term "ripe" in this context signifies that the court "read into the law a need for the motion to be 'ripe' . . . ." It is clear that the term "ripe" was simply intended to convey the court's belief that the motion could not be granted because the required eight months of *includable* time had not passed, and thus the motion was premature.

[5] This appears to be either a misstatement or a typographical error in the transcript, as the record indicates that the last prior hearing was held on December 3, 2004.

over attorneys by the defense . . . . So I just want it to be clear on the record . . . that the only [includable] time in this case is from December 30, 2004,[6] until January 19, 2005. That's the only time period the state requested for a continuance.

"The Court: Do you want to be heard on that?

"[Defense Counsel]: Not at this time, Your Honor."[7]

On September 2, 2005, the defendant filed a second motion for a speedy trial, as well as a motion to dismiss on the basis of the court's denial of his initial speedy trial motion of October 22, 2004. The trial court held a hearing on these motions on September 14, 2005. At that hearing, the following colloquy occurred:

"The Court: When was the case ripe for the filing of the speedy trial motion?

"[Assistant State's Attorney]: Your Honor, I don't know off the top of my head. I have to get [Attorney] Goetz in, sit down and figure that out.

"[Defense Counsel]: . . . I was monitoring the situation. I spoke with [Attorney] Goetz. He would say within the last couple of weeks, the latter part of August, say, late August of this year.

"The Court: All right. And then the speedy trial motion was filed.

---

[6] See footnote 5 of this opinion.

[7] The record indicates that the defendant personally raised the speedy trial issue again at a hearing on August 10, 2005. Defense counsel indicated to the court that he had a conflict of opinion with the defendant over whether to file a motion to dismiss for lack of a speedy trial and that the defendant wanted to address the court about it himself. The defendant once again demanded to know why his October 22, 2004 motion for a speedy trial had been denied. He then indicated that he was "going to file a motion to dismiss because [the court] denied my speedy trial." The trial court again referenced its finding regarding the excludable time and maintained its belief that the motion had not been "ripe . . . ."

\* \* \*

"[Defense Counsel]: September 2.

\* \* \*

"The Court: It was from October 22, 2004, until September 2, 2005. There were no motions for a speedy trial filed within that period.

"[Defense Counsel]: That's correct.

"The Court: Therefore, even if he had been eligible to file a speedy trial motion, the fact remains, he didn't file [one].

"[Defense Counsel]: We were monitoring, I was working, I was inquiring of [Attorney] Goetz and monitoring the situation to file it, you know.

"The Court: When it was appropriate?

"[Defense Counsel]: Yes.

"The Court: You were up to speed on those calculations and the clock running so that when it was time that it could have been filed, you filed it?

"[Defense Counsel]: Yes.

"The Court: Okay. All right. So given all of those circumstances, the motion to dismiss is denied."[8]

This denial of the defendant's motion to dismiss forms the basis for the first issue of the present appeal.

We begin by noting the standard that this court applies in reviewing a trial court's ruling on a motion to dismiss. "A motion to dismiss . . . properly attacks

---

[8] We note that jury selection began on the same day as this hearing. Thus, the trial "commenced" for speedy trial purposes within thirty days of the September 2, 2005 speedy trial motion. See Practice Book § 43-42 ("[f]or purposes of Sections 43-39 through 43-41, 'commencement of trial' means the commencement of the voir dire examination in jury cases and the swearing-in of the first witness in nonjury cases").

the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [denial] of the motion to dismiss will be de novo." (Internal quotation marks omitted.) *State* v. *Welwood*, 258 Conn. 425, 433, 780 A.2d 924 (2001). Factual findings underlying the court's decision, however, will not be disturbed unless they are clearly erroneous. See, e.g., Practice Book § 60-5; *State* v. *Wiggs*, 60 Conn. App. 551, 553, 760 A.2d 148 (2000). The applicable standard of review for the denial of a motion to dismiss, therefore, generally turns on whether the appellant seeks to challenge the legal conclusions of the trial court or its factual determinations.

In order to determine whether the defendant's motion to dismiss was properly denied in this case, however, we must determine preliminarily whether the defendant was, in fact, denied his statutory right to a speedy trial. If the defendant *was* denied a speedy trial, then we must determine whether he filed a procedurally proper motion to dismiss on the basis of that denial. The parties disagree as to whether the resolution of these issues involves questions of law or findings of fact. The defendant seeks to characterize this issue as a question of statutory interpretation subject to plenary review, framing his arguments as a challenge to the trial court's interpretation of General Statutes § 54-82m[9] and Practice Book § 43-39 et seq. The state, on the other hand,

[9] The defendant's brief erroneously refers to General Statutes § 54-82*l*, which, because of the enactment of § 54-82m, applies only to individuals who are charged with crimes between July 1, 1983, and June 30, 1985. For those individuals charged with crimes on or after July 1, 1985, General Statutes § 54-82m (1) provides in relevant part: "[W]hen [a] defendant is incarcerated in a correctional institution of this state pending . . . trial and is not subject to the provisions of section 54-82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later . . . ."

articulates the issue as whether the defendant has been denied access to a speedy trial, which it asserts is a question of fact subject to a clearly erroneous standard of review.

Although this court has never explicitly addressed the question of the appropriate standard of review for speedy trial determinations,[10] the Appellate Court consistently has applied the clearly erroneous standard to such questions. "The determination of whether a defendant has been denied his right to a speedy trial is a finding of fact, which will be reversed on appeal only if it is clearly erroneous. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Internal quotation marks omitted.) *State* v. *Cote*, 101 Conn. App. 527, 532, 922 A.2d 322, cert. denied, 284 Conn. 901, 931 A.2d 266 (2007); accord *State* v. *Nicholson*, 71 Conn. App. 585, 597, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002); *State* v. *Lacks*, 58 Conn. App. 412, 417, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000); *State* v. *Rodriguez*, 47 Conn. App. 91, 98, 702 A.2d 906 (1997), cert. denied, 243 Conn. 960, 705 A.2d 552 (1998). The rationale behind this approach takes into consideration the individual complexities inherent in every criminal prosecution and, thus, allows the fac-

---

[10] Our research revealed that the earliest reference to the application of the clearly erroneous standard of review in connection with a speedy trial claim was in *State* v. *Green*, 38 Conn. App. 868, 870–71, 663 A.2d 1085 (1995) ("[t]he determination of whether a defendant has been denied his right to a speedy trial is a finding of fact, which will be reversed on appeal only if it is clearly erroneous"). In support of this proposition, *Green* cites to *State* v. *Flowers*, 198 Conn. 542, 503 A.2d 1172 (1986). In *Flowers*, this court applied the clearly erroneous standard of review in examining a challenge to the trial court's denial of a motion to dismiss on speedy trial grounds. Id., 544. The trial court found that the delay in the case had been "due to court congestion and not the result of any tactical decision on the part of the state." Id. Without explanation, we declared that, "[o]n appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous." (Internal quotation marks omitted.) Id.

tual circumstances of each case to dictate, to some extent, the practical import of the speedy trial right. "Although the right to a speedy trial is fundamental, it is necessarily relative, since a requirement of unreasonable speed would have an adverse impact both on the accused and on society." (Internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 117, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); see also *United States* v. *Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 15 L. Ed. 2d 627 (1966) ("A requirement of unreasonable speed would have a deleterious effect both [on] the rights of the accused and [on] the ability of society to protect itself. Therefore . . . [t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends [on] circumstances." [Internal quotation marks omitted.]).

We previously have recognized, however, that, under certain circumstances, a speedy trial claim may involve questions of statutory interpretation requiring plenary review. In *State* v. *McCahill*, 265 Conn. 437, 828 A.2d 1325 (2003), we were presented with the issues of "whether the misfiling of the defendant's motion constituted 'exceptional circumstances' and, therefore, 'good cause' for the failure to begin the defendant's trial within thirty days after the filing of his speedy trial motion, and whether dismissal of the information therefore was not required." Id., 446. Noting that there was no factual dispute, we characterized these issues as "questions of law involving the interpretation of § 54-82m and Practice Book §§ 43-40 and 43-41 . . . ." Id. In distinguishing the circumstances present in *McCahill* from the well established precedent of the Appellate Court uniformly applying the clearly erroneous standard of review, we noted that "[t]he trial court in each of those [Appellate Court] cases necessarily had to calculate the amount of excludable time based on factual findings"; id., 445; and that the standard applied in those cases "must be

read in the context of a case in which factual findings necessarily were in dispute." Id. In making this distinction, we implicitly endorsed the approach established by the Appellate Court in those cases when appropriate.

Thus, in order to determine the appropriate standard of review for the defendant's claim in the present case, we first must ascertain whether the defendant is truly challenging the trial court's interpretation of the pertinent law, in which case our review is plenary; see, e.g., *West Haven* v. *Norback*, 263 Conn. 155, 162, 819 A.2d 235 (2003) ("[i]n matters requiring interpretation of statutes our review is plenary"); or whether he is actually disputing the court's factual findings, in which case we review those findings for clear error. See, e.g., *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 87, 931 A.2d 237 (2007) ("[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous" [internal quotation marks omitted]).

The defendant makes four arguments challenging the trial court's actions with respect to his speedy trial motions and motion to dismiss. The first two arguments involve questions of statutory interpretation, whereas the remaining two involve questions of fact. We will address these arguments in turn.

The defendant first contends that he "has a constitutional right to be brought to a speedy trial, [and] depriving him of that right must require some level of proof by the state that a [Practice Book] § 43-40 exemption applies." The defendant appears to argue that the trial court incorrectly interpreted the law because it impermissibly placed the burden on him to prove that his speedy trial motion was filed after the appropriate amount of includable time had passed.[11] We do not agree.

---

[11] The state did not respond to this argument in its brief, and the issue did not arise at oral argument.

Pursuant to Practice Book § 41-6,[12] it is the defendant's responsibility, when making a pretrial motion, to include "a statement of the . . . factual and legal [or other] basis" supporting the motion. See *State* v. *Bangulescu*, 80 Conn. App. 26, 31, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003). This requirement serves to provide notice to the opposing party, in this case the state, of the grounds on which the motion is made, and allows the preparation of an appropriate response. Although we have never specifically addressed the defendant's burden with respect to a motion for a speedy trial, the procedural principles underlying § 41-6 require that the defendant's motion, at a minimum, allege a prima facie violation of Practice Book § 43-39. See *People* v. *Ortiz*, 313 Ill. App. 3d 896, 900, 731 N.E.2d 937 ("[although] it is the [s]tate's duty to bring a defendant to trial within the statutory period, on a motion to dismiss alleging a statutory speedy trial violation, the burden of proof rests with the defendant"), appeal denied, 191 Ill. 2d 551, 738 A.2d 933 (2000); *State* v. *Kivett*, 321 N.C. 404, 408, 364 S.E.2d 404 (1988) (defendant has burden of "supporting" motion to dismiss on speedy trial grounds). Such a motion must include the specific dates of delay that, according to the defendant, are includable in the speedy trial calculation. Only with this information can the state be expected to respond meaningfully to a speedy trial motion, and the court to make an appropriate determination as to its validity. Because, generally, both parties have at least equal access to the underlying causes of any pre-

---

[12] Practice Book § 41-6 provides: "Pretrial motions shall be written and served in accordance with Sections 10-12 through 10-17 unless, for good cause shown, the judicial authority shall grant permission to make an oral pretrial motion. Every written motion shall include a statement of the factual and legal or other basis therefor, shall state whether the same or a similar motion was previously filed and ruled upon, and shall have annexed to it a proper order. All defenses and objections that must be raised by motion prior to trial shall, to the extent possible, be raised at the same time."

trial delays, we can conceive of no reason why the defendant should be relieved of this minimal burden. Cf. *Albert Mendel & Son, Inc.* v. *Krogh*, 4 Conn. App. 117, 124 n.6, 492 A.2d 536 (1985) ("[i]t is said that the burden [of proof] properly rests upon the party who must establish the affirmative proposition, to whose case the fact in question is essential . . . [or] who has readier access to knowledge about the fact").

In this case, the defendant's speedy trial motion failed to provide a sufficient factual and legal basis to support his contention that he was eligible for a speedy trial under Practice Book § 43-39. Pursuant to § 43-39, a defendant continuously incarcerated pending trial on criminal charges must receive a trial on those charges within eight months from the date of his arrest or the filing of the information, whichever is later. Practice Book § 43-39 (d). This requirement is subject to Practice Book § 43-40, which provides for various periods of time that are not includable in the computation under § 43-39. In his October 22, 2004 motion for a speedy trial, the defendant merely asserted that he was arrested on March 28, 2003, and had been incarcerated since that date, without specifying the eight month period allegedly includable in the speedy trial calculation. The mere recitation of the defendant's arrest date, coupled with a bare allegation that he is due a speedy trial, is not sufficient to satisfy the basic requirements of Practice Book §§ 41-6 and 43-41.

Moreover, defense counsel clearly indicated during the October 27, 2004 hearing on the speedy trial motion that he did not have a basis in fact for making the speedy trial motion. Defense counsel admitted that, because he was not involved in the case, he could not speak to whether any time prior to his appointment as defense counsel on June 3, 2004, was includable in the speedy trial calculation. With respect to the delay between June 3 and October 22, 2004, defense counsel

conceded that "[he] . . . need[ed] time to review the file, [conduct] discovery, talk to [the defendant] and continue to conduct investigation." Because the defendant himself could not provide a sufficient factual basis for the speedy trial motion, the state was without notice as to what period of time was being challenged and, thus, could not effectively respond to the motion.

The state instead relied on the representations that Goetz had made, at the request of the court, with respect to whether the speedy trial motion was premature in light of *his* calculation of the excludable time. The court appeared to credit these representations, made by an officer of the court charged with monitoring and recording case flow, and the defendant did not contest their accuracy. Indeed, defense counsel essentially conceded the propriety of Goetz' calculations, at least with respect to the period after defense counsel began representing the defendant. It was on this basis that the court denied the speedy trial motion. We cannot conclude, even assuming that we were to agree with the defendant that the state has the burden of proving excludable time under Practice Book § 43-40, that the court interpreted § 54-82m or the rules of practice otherwise in light of the defendant's failure to meet his threshold burden of articulating the factual and legal basis for his speedy trial motion.

The defendant's second argument purportedly implicating a question of statutory interpretation is that the trial court "added an element to [Practice Book §] 43-40 [in ruling] that the defendant's motion was not ripe."[13] As we previously explained; see footnote 4 of this opinion; this argument is unpersuasive.

Practice Book § 43-41 provides in relevant part: "If the defendant is not brought to trial within the applica-

[13] We believe the defendant intends to refer in this statement to Practice Book § 43-41, which deals with the filing of a speedy trial motion, rather than § 43-40, which concerns the computation of excludable time.

ble time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period. . . ." It is clear from the face of this provision that, to be "ripe," or timely, a speedy trial motion must be made "at any time *after* [the] time limit [set forth in §§ 43-39 and 43-40] has passed . . . ." (Emphasis added.) Practice Book § 43-41. It is clear from the context in which the trial court[14] used the word "ripe" that it was not using it as a legal term of art. Rather, it is apparent that the court used the term in a commonsense fashion, that is, to explain that the defendant's speedy trial motion was being denied because it was premature. Because the court had determined that the time period in question was excludable under §§ 43-39 and 43-40, it dismissed the speedy trial motion as premature.

The defendant's remaining two claims are that "the 'good causes' set forth in [Practice Book] § 43-40 either do not apply in this case, or there is no evidence to support their administration," and that "the [trial] court was without a basis that was consistent with [§] 43-40 in denying the defendant's [speedy trial] motion." These claims are directed at the heart of the trial court's factual findings with respect to the applicability of the various excludable time provisions of § 43-40. "[A]lthough the defendant has framed his argument as a challenge to the court's interpretation and application of the speedy trial statute . . . the defendant essentially challenges the court's factual findings with respect to excludable time from speedy trial calculations. [As

---

[14] We note that two different trial judges in this case actually used the term "ripe" in referring to a speedy trial motion that is premature based on excludable time.

we stated previously, the] standard of review for this type of challenge is well established. The determination of whether a defendant has been denied his right to a speedy trial is a finding of fact, which will be reversed on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) *State* v. *Cote*, supra, 101 Conn. App. 532.

Considering the available evidence of the time period between March 28, 2003, and October 27, 2004, we cannot conclude that the court's denial of the October 22, 2004 motion for a speedy trial was clearly erroneous. The record, such as it is, indicates that at least some of this delay was granted at the request of the defendant, and that period of time, therefore, is excludable under Practice Book § 43-40 (7).[15] See *State* v. *Brown*, 242 Conn. 389, 404, 699 A.2d 943 (1997) ("[A]n incarcerated defendant must be brought to trial within eight months, *plus* any excludable time calculated under the rules promulgated by the judges of the Superior Court, of his arrest or the filing of an information, whichever is later. Once that time has passed, he may then file a motion for a speedy trial." [Emphasis added.]). The only evidence relating to the unexplained gaps between proceedings is Goetz' statement to the court on October 27, 2004, that the "defendant has excludable time status since . . . July of 2003." The defense did not challenge Goetz' assessment. Moreover, defense counsel's admission that he "did need time to review the file, [conduct] discovery, talk to [the defendant] and continue to conduct investigation," suggests that an indeterminate amount of the delay between June 3, 2004, and October 27, 2004, was the result of continuances requested by the defense, which also is excludable under § 43-40 (7). The defendant has not challenged Goetz' representation that the speedy trial motion was premature as of October 27, 2004, due to excludable time, nor has he ex-

---

[15] See footnote 2 of this opinion.

plained defense counsel's acquiescence thereto. In the absence of any evidence to the contrary, and considering the paucity of information in the defendant's motion, we cannot conclude that the trial court improperly relied on Goetz' calculations in denying the defendant's October 22, 2004 motion for a speedy trial.

The defendant's claim with respect to the subsequent motion to dismiss based on his October 22, 2004 motion for a speedy trial also must fail. Because we have concluded that the trial court properly denied that speedy trial motion, any motion to dismiss based on the speedy trial motion is subject to denial as well. Practice Book § 43-41 clearly sets forth the procedure that a defendant must follow to move for a dismissal on the basis of a speedy trial motion. First, the defendant must file a speedy trial motion *after* the "applicable time limit set forth in Sections 43-39 and 43-40" has elapsed. Practice Book § 43-41. Once such a motion is properly filed, the state has thirty days to commence the trial. If the trial is not commenced within that thirty day window, then "the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period." Practice Book § 43-41. In order to file a cognizable motion to dismiss, therefore, the defendant was required to wait until sufficient time had passed, i.e., at least eight months of *includable* time, before refiling his motion for a speedy trial. The following colloquy indicates that both the court and defense counsel understood this aspect of § 43-41:

"The Court: It was from October 22, 2004, until September 2, 2005. There were no motions for a speedy trial filed within that period.

"[Defense Counsel]: That's correct.

"The Court: Therefore, even if he had been eligible to file a speedy trial motion, the fact remains, he didn't file [one].

"[Defense Counsel]: We were monitoring, I was working, I was inquiring of [Attorney] Goetz and monitoring the situation to file it, you know.

"The Court: When it was appropriate?

"[Defense Counsel]: Yes.

"The Court: You were up to speed on those calculations and the clock running so that when it was time that it could have been filed, you filed it?

"[Defense Counsel]: Yes."[16]

The defendant filed a new motion for a speedy trial on September 2, 2005. On the same day, he filed a motion to dismiss, specifically referring to the October 22, 2004 speedy trial motion. Having concluded that the first motion for a speedy trial was properly denied, we conclude that the trial court properly denied the defendant's subsequent motion to dismiss.

II

The defendant next claims that the trial court denied him his right to a fair trial by allegedly discussing his public defender's potential conflict of interest with trial counsel in chambers and outside the defendant's presence. The defendant asserts that this resulted in a structural error requiring this court to reverse the judgment of conviction. The state does not respond to the substance of this claim but, rather, argues that it is not reviewable because the defendant has failed to provide this court with an adequate record for review. We agree with the state.

The following additional facts are relevant to our analysis of this claim. Throughout the various stages of this case, the defendant was represented by the office of the public defender in the judicial district of Hartford.

---

[16] We note that this admission by defense counsel provides further support for our determination that the *first* speedy trial motion was premature.

During the lengthy pretrial phase, the defendant was represented by various attorneys from that office. One of these attorneys, Lisa Sosa, represented the defendant at various hearings on April 8, May 12 and 15, June 17, September 10, and November 24, 2003. The defendant's trial counsel, Michael Isko, first appeared in this case on June 3, 2004, at which point he appears to have taken over the representation of the defendant.[17] Isko was assisted at trial by Attorney Robert Meredith, also from the office of the public defender.

During this pretrial period, questions arose about two potential conflicts of interest involving the public defender's office. One of the potential conflicts involved Isko's prior representation of Damon Fagan, whose name was mentioned by a witness in a police report during the underlying investigation and who thus was a potential witness in the defendant's case. The court held a hearing on the matter and determined that Isko's prior representation of Fagan did not present a conflict because neither the state nor the defense intended to call Fagan as a witness.

The other potential conflict involved Sosa's representation of Negus Jones. At one point, Sosa represented both Jones and the defendant concurrently. The record indicates that Sosa was appointed to represent the defendant on April 8, 2003, and subsequently was appointed to represent Jones on December 23, 2003. At some point between December 23, 2003, and March 25, 2004, Sosa became aware of a potential conflict and sought to withdraw from representing Jones.[18] After

[17] Isko was assisted at various pretrial proceedings by other members of the public defender's office. Their identity is not relevant to our resolution of this issue.

[18] The record is unclear regarding the nature of the conflict that caused Sosa to seek to withdraw from representing Jones. There is some indication that the conflict was not initially between Jones and the defendant in this case but, rather, between Jones and one of his codefendants, both of whom were represented by the Hartford public defender's office. The exact reason for Sosa's withdrawal is immaterial to our analysis, however. Both parties

speaking to her supervisor, Sosa was removed from representing Jones, and Jones' case was assigned to a special public defender. At some point prior to Sosa's withdrawal from representing Jones, the defendant confessed to Jones, in some detail, that he had murdered the victim. The state expressed concern that Sosa's conflict of interest could be imputed to Isko through their common association with the office of the public defender.

The court held three lengthy hearings on these two potential conflicts, eventually finding that neither one amounted to a conflict requiring a waiver by the defendant. On several occasions during these hearings, the participants referred to discussion taking place "in chambers."[19] These references do not contain any de-

agree that Sosa's representation of Jones was a conflict of interest because of her concurrent representation of the defendant, and that she acted appropriately in seeking to withdraw from the case involving Jones. At issue in the trial court was whether Sosa's conflict tainted Isko's representation through imputation.

[19] The following statements were made at the various hearings, and are the only evidence relating to the in chambers conferences:

At the August 10, 2005 hearing, the following colloquy occurred:

"The Court: And it came to my attention that there is some question whether or not there's a conflict of interest here. We did discuss the matter in chambers a week or two ago. I'm not sure of the date certain. . . .

\* \* \*

"[Assistant State's Attorney]: . . . Apparently, what I learned in our conference meeting in chambers was that . . . Sosa had originally represented . . . [the defendant] and she subsequently was assigned . . . Jones' case. After a period of time when she was [involved] in both cases, she withdrew from . . . Jones' case, and he was subsequently [assigned other counsel]. . . .

\* \* \*

"[Assistant State's Attorney]: Your Honor, I just want to place on the record as well that, when we had the chambers conference . . . Isko indicated that he had not looked at . . . Jones' file, and someone on the defense team represented that there [is] a different investigator, public defender investigator, appointed for . . . Jones' case than there is for [the defendant's] case, and that that person would not have—there would not be a transmittal of information between those two."

At the August 12, 2005 hearing, the court made the following remark: "Well, the state has really asked for this inquiry, and the court is following

tails concerning the parties present at these conferences or what was specifically discussed. Nevertheless, the defendant claims that, based on these references, he was deprived of his constitutional right to be present at a critical stage in his prosecution.

The constitutional right of a criminal defendant to be personally present at all significant junctures of his prosecution is a "fundamental tenet of criminal jurisprudence . . . ." *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004). "[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." *Rushen* v. *Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983). The right of the defendant to be present has been extended, via the due process clause, beyond its origins in the confrontation clause of the sixth amendment to encompass "situations [in which] the defendant is not actually confronting witnesses or evidence against him." *State* v. *Lopez*, supra, 732; see also *Monroe* v. *Kuhlman*, 433 F.3d 236, 246 (2d Cir. 2006) ("[t]he [United States] Supreme Court has held that the right to be present at one's criminal trial is protected by due process in cases [in which] . . . the claimed error does not relate to the defendant's opportunity to confront witnesses or evidence"). "In judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the [fullness] of his opportunity to

up on that request. We've had an in chambers meeting today following Wednesday's in chambers discussion." The court also stated at that same hearing: "Now, I was looking at—what caused me to go over this area, I was looking at Practice Book section, as I mentioned in chambers, which is 111 I believe."

At the September 9, 2005 hearing, the assistant state's attorney remarked: "The *Fagan* matter was discussed in chambers, Your Honor."

defend against the charge." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 732, quoting *Kentucky* v. *Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987).

The defendant claims that any discussions conducted in chambers regarding the potential conflicts involving his representation constituted a critical stage of his prosecution. Our Appellate Court, faced with a similar claim under similar circumstances, recently declared that, although "an in camera inquiry regarding a potential conflict of interest *may* constitute a critical stage of a prosecution . . . it does not follow that *all* in chambers discussions constitute a critical stage of the prosecution." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hazel*, 106 Conn. App. 213, 220, 941 A.2d 378, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008). Applying the test set forth in *Lopez* to determine whether a particular in camera proceeding qualifies as a critical stage of the prosecution is a necessarily fact intensive inquiry. Thus, "it is imperative that the record reveal the scope of discussion that transpired." Id.

The record in the present case is deficient in this regard. After thoroughly reviewing the relevant transcripts, we are unable to uncover a sufficient factual basis on which to determine whether the defendant's presence was constitutionally required at the in camera discussions in question. Indeed, the defendant conceded, both in his reply brief and at oral argument before this court, that the record is devoid of any indication that he was absent from these discussions. Furthermore, apart from a few oblique references, the record does not reveal, in any useful detail, the scope of the discussions that transpired. Thus, "we are left to speculate as to whether the [in camera] conversation[s] consisted of the court and counsel conducting an extensive discussion as to [the] potential conflict[s] of interest at

one end of the spectrum or, at the opposite end, a brief comment to the court that there was a matter that needed to be placed on the record, or . . . dialogue that fell somewhere in between. As a result, we cannot determine the extent to which a fair and just hearing would have been thwarted by the defendant's absence or whether his presence has a reasonably substantial relation to the fullness of his opportunity to defend against the criminal charges." Id., 221; see also *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006) ("Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." [Internal quotation marks omitted.]).

Pursuant to Practice Book § 61-10,[20] it is the appellant, the defendant in this case, who bears the burden of providing an adequate record for review on appeal. Although the defendant has failed to satisfy this burden, he maintains that the very lack of an adequate record regarding the in camera discussions supports his contention that such discussions represent structural error requiring reversal. We are not persuaded. The defendant failed to request a hearing on this claim in the trial court to create a record for appellate review. Instead, the defendant asks this court to speculate about the constitutional significance of the in chambers discussions and to reverse his conviction on the basis of that speculation. We decline to do so. Although the defendant may have other avenues available to pursue this claim, we conclude that the record is inadequate for us to review it on direct appeal.

---

[20] Practice Book § 61-10 provides in relevant part: "It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. . . ."

## III

Finally, the defendant challenges the trial court's admission of the murder weapon and testimony regarding its chain of possession. The defendant claims that the admission of a nine millimeter Glock handgun, which the state sought to establish as one of the weapons used to murder the victim, and testimony by Robert Bornstein, a special agent with the Federal Bureau of Investigation, regarding its chain of possession, was improper because this evidence was not relevant and was unduly prejudicial. The defendant also argues that certain testimony by Bornstein and Negus Jones relating to the gun was improperly admitted because, once it was introduced, the defendant was unable to cross-examine the individuals who had led investigators to the gun.[21] These claims are without merit.

The following additional facts are relevant to this claim. On November 1, 2005, the defendant filed a motion in limine in which he sought to exclude the alleged murder weapon, a Glock handgun, as well as certain testimony relating to the gun. Over defense counsel's objections, the court admitted the gun itself, as well as Bornstein's testimony regarding its chain of possession. Bornstein testified that, in December, 2002, he was working with the Hartford police investigating a shooting death that occurred on Cabot Street in Hartford. During the course of his investigation, Bornstein received a tip regarding a weapon that was allegedly used in the murder. The information he received was that an individual named Eon Whitley had come into possession of the firearm, and that Whitley had received the weapon from a man named Tyree Downer.

---

[21] To the extent the defendant argues that he was unable to cross-examine certain witnesses, he does not make a colorable constitutional claim but, rather, challenges the court's admission of certain hearsay statements. This is clearly an evidentiary challenge, and we therefore analyze it as such.

Bornstein testified that, after tracking down Whitley, he discovered that Whitley had given the gun to another individual. With Whitley's cooperation, Bornstein arranged to retrieve the Glock handgun via a controlled purchase. Upon recovering the weapon, Bornstein sent it to the state laboratory for ballistics analysis. Subsequent ballistics testing confirmed that multiple shell casings found at the crime scene had been fired from the gun that Bornstein had recovered.

Another witness, Jones, testified that the defendant had confessed to committing the murder while they were incarcerated together sometime in the spring of 2004. The defendant told Jones that he and Calvin King began shooting at the victim when the victim attempted to drive off without paying for a quantity of crack cocaine that the defendant had given him. During the course of that confession, the defendant told Jones that, after he had shot the victim and fled the scene, he instructed King, who also was subsequently charged in connection with the shooting, to "get rid of the guns." Jones testified that the defendant had told him that King had sold the Glock nine millimeter handgun to Downer.

In addition to this evidence, three witnesses testified at trial that they had seen the defendant carrying a black handgun on the night of the murder. Annabelle Trimmier testified that she had let the defendant and King into her apartment that night to use her telephone and that she had seen them openly handling two guns, one black and one silver colored. Latifah Solomon, a witness who was with the defendant on the night of the murder, testified that she had seen the defendant with a black handgun just prior to the shooting. Solomon also testified that she had seen the defendant fire his gun in the direction of the victim. Brittaney Simpson, who had been socializing with the defendant that night and who also witnessed the murder, testified that she

had seen the defendant pointing a black handgun at the victim's car when she heard gunfire.

We begin our analysis of this claim with a recitation of the firmly established and highly deferential standard of review that is applied to a trial court's evidentiary rulings. Although certain evidentiary rulings are subject to plenary review; see, e.g., *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007) ("[t]o the extent a trial court's admission of evidence is based on an interpretation of [a rule of evidence], our standard of review is plenary"); the vast majority of such determinations are within the trial court's discretion and will not be overturned in the absence of a manifest abuse of that discretion. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." *State* v. *Avis*, 209 Conn. 290, 298, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). "We will make every reasonable presumption in favor of upholding the trial court's ruling . . . and only upset it for a manifest abuse of discretion." *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994). We conclude that, in the present case, it is most appropriate that we review the trial court's determinations with respect to the relevance and prejudicial effect of the challenged evidence for an abuse of discretion. See, e.g., *State* v. *Saucier*, supra, 219 (trial court is "vested with the discretion to admit or to bar the evidence based [on] relevancy, prejudice, or other legally appropriate grounds"); *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997) ("trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence" [internal quotation marks omitted]).

Within the law of evidence, relevance is a very broad concept. Evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or

less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Coleman*, supra, 241 Conn. 788–89, quoting *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995).

We are convinced that the disputed evidence was clearly relevant. The handgun corroborated the testimony of several eyewitnesses who testified that they saw the defendant with a black handgun just prior to or during the shooting. Two witnesses testified that they observed the defendant pointing a black handgun at the victim's car at the same time that shots were being fired. On the basis of information that Jones had relayed to the police, investigators were able to track down a gun that matched the general description of the gun possessed by the defendant and that was positively matched with shell casings found at the murder scene. The accuracy of the information that Jones provided to the police with respect to King's ultimate disposal of the Glock handgun strongly suggests that the defendant did confess to Jones, which served to corroborate Jones' testimony about the gun and implicitly bolstered the credibility of the remainder of Jones' testimony. The physical evidence of the murder weapon also tied other physical evidence found at the crime scene, namely, the shell casings, to the defendant. Such evidence, viewed in its entirety, is clearly relevant to the ultimate issue of the defendant's guilt.

Our inquiry, however, cannot end here. Even relevant evidence may be excluded if it has a tendency to prejudice unduly the minds of the jurors. "Relevant evidence is excluded . . . when its probative value is outweighed by the danger of unfair prejudice." *State* v. *Ferguson*, 260 Conn. 339, 359, 796 A.2d 1118 (2002); see also Conn. Code Evid. § 4-3. "To be unfairly prejudicial, evidence must be likely to cause a disproportionate emotional response in the jury, thereby threatening to overwhelm its neutrality and rationality to the detriment of the opposing party." *State* v. *Burney*, 288 Conn. 548, 565, 954 A.2d 793 (2008). We have recognized four situations in which the "potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 563, 958 A.2d 1214 (2008), quoting *State* v. *Pappas*, 256 Conn. 854, 888, 776 A.2d 1091 (2001). Here again, however, the trial court's determination is given great deference on review. "[T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court . . . and is subject to reversal only [when] an abuse of discretion is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Rinaldi*, 220 Conn. 345, 355, 599 A.2d 1 (1991).

The trial court properly determined that the admission of the murder weapon was not unduly prejudicial to the defendant. The defendant's claim of undue preju-

dice focuses on the first factor, namely, that the disputed evidence "unduly arouse[d] the [jurors'] emotions, hostility or sympathy . . . ." (Internal quotation marks omitted.) *State* v. *Allen*, supra, 289 Conn. 563. In his brief, the defendant asserts that, "there was little chance that a juror could do anything other than associate the defendant with the gun. Witness testimony, at that point, hardly matters. The social import of a gun, when coupled with the sensational portrayal of very violent events, practically defines the word 'prejudicial.' " We disagree. It is not enough that this evidence may have been damaging to the defendant. "A mere adverse effect on the party opposing admission of the evidence is insufficient. . . . Evidence is prejudicial when it tends to have some adverse effect [on] a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Burney*, supra, 288 Conn. 565–66. The defendant provides no support for his assertion that, "[i]ntroducing an actual handgun claimed to be a murder weapon is one of the most prejudicial acts a prosecutor can perform." Although an alleged murder weapon, when tied to the crime and to the defendant accused of committing the crime, may represent a particularly compelling piece of evidence, this fact alone does not create an unduly prejudicial effect. We cannot find any indication in the record that the murder weapon was admitted, displayed to the jury, or otherwise used by the state in such a manner as to "unduly arouse the [jurors'] emotions, hostility or sympathy . . . ." (Internal quotation marks omitted.) *State* v. *Allen*, supra, 563.

Finally, the defendant claims that the trial court improperly admitted Jones' testimony about what King had told the defendant that he did with the Glock handgun over defense counsel's hearsay objection. He makes a similar claim with respect to Bornstein's testimony

about certain statements that Whitley made regarding what he had done with the Glock handgun after receiving it from Downer. To the extent the defendant claims that the trial court improperly admitted certain hearsay statements through the testimony of Jones and Bornstein, he fails to meet his burden of proving that the admission of these statements, even if improper, was harmful.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 352, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). We have concluded that "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 357, quoting *United States* v. *Grinage*, 390 F.3d 746, 751 (2d Cir. 2004).

We previously have considered a number of factors in determining whether a defendant has been harmed by the admission or exclusion of particular evidence. "Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d

604 (2001). Considering these various factors, we have declared that "the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." *State* v. *Sawyer*, supra, 279 Conn. 357.

Even if we assume, arguendo, that the challenged evidence was improperly admitted, the defendant has failed to show that such impropriety was harmful. Considering the overwhelming weight of the other evidence in the record, we cannot conclude that the verdict was substantially swayed by the error alleged by the defendant. Two eyewitnesses testified that they saw the defendant pointing a gun at the victim's car at the time of the shooting. Trimmier testified that she witnessed the defendant and King fleeing the scene immediately after the shooting, and that the defendant called her repeatedly that evening and essentially confessed his guilt to her. In addition, the state presented Jones' testimony regarding the defendant's jailhouse confession that he had fatally shot the victim. Given the strength of this evidence, the disputed testimony, while compelling, was not vital to the state's case. Moreover, there was ample additional evidence corroborating the challenged hearsay testimony, and there was no evidence offered to contradict it. Finally, the defendant had a full opportunity to cross-examine both Bornstein and Jones. In view of the overall strength of the state's case, we are convinced that any impropriety in admitting the hearsay statements was harmless.

We conclude, therefore, that the court did not abuse its discretion in admitting the Glock handgun into evidence. Furthermore, the testimony that the state elicited from Bornstein regarding the provenance of the weapon was relevant to connect it to the defendant on the night of the murder, and, even if the admission

of any hearsay through the testimony of Jones and Bornstein was improper, it was harmless.

The judgment is affirmed.

In this opinion the other justices concurred.