******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DERRICK BOUKNIGHT
(SC 19326)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued October 17—officially released November 22, 2016*

*Richard E. Condon, Jr.*, senior assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Michael Dearington*, former state's attorney, and *Michael Pepper*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Derrick Bouknight, appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), using a firearm in the commission of a felony in violation of General Statutes § 53-202k, carrying a pistol without a permit in violation of General Statutes § 29-35, and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1). On appeal, the defendant claims that the trial court abused its discretion in ruling that a Facebook[2] profile page and photographs thereon were properly authenticated.

The following facts and procedural history are relevant to the present appeal, which arises out of a deadly shooting in the city of New Haven following a dispute between the victim, William Baines, and some of his neighbors. Baines lived in a house on West Division Street in New Haven with his girlfriend, Norma Monique Walters, and her cousin Ella Charie Evans. On October 9, 2010, Baines had won a physical altercation with Sherrod Daniels, which had started over a $100 debt that Baines believed Daniels owed him. Later that day, Baines and Daniels engaged in a verbal argument near the intersection of West Division Street and Dixwell Avenue. Walter's mother, Patricia Outlaw, was in the vicinity, intervened, and told Baines to calm down. After speaking briefly with Outlaw, Baines headed back to his house, which was just a short distance away. Soon thereafter, Daniels approached Baines' house with two other individuals. One of these individuals gave Outlaw $100 which was, in turn, given to Baines.

Later, there was an altercation between Baines and Korey Streater, who was a friend of Daniels. During that altercation Baines punched Streator and knocked him to the ground in front of a crowd of spectators. Again, Outlaw intervened and broke up the conflict.

A short while later, Baines was sitting on the front steps of his house with his mother, Tracy Fulton, his cousin, Michael Nicholson, and Nicholson's friend, Anthony Little. As Nicholson spoke to Baines, the defendant approached through an empty lot adjacent to the house. The defendant and Baines engaged in a heated discussion, during which the defendant demanded to know where the money was. Baines replied, "[I]t ain't got nothing to do with you," "it's mine," and "I don't owe nobody no money . . . ." The defendant and Baines continued to argue like this for a few minutes.

Evans, who had been inside the house, came out onto the porch. She recognized the defendant, with whom she was very familiar from having lived in the area. Evans observed that the defendant was wearing a plaid shirt with a black hood and a baseball cap that bore "some type of [crossed] symbol" and had a red under-

side to its bill. He was also wearing a pair of acid-washed jeans, which Evans had noticed him wearing on previous occasions.

As the argument between the defendant and Baines escalated, Baines stood up from the steps, and the defendant pulled out a black semiautomatic handgun. Both Evans and Nicholson observed that the defendant was wearing a black glove on his right hand, with which he held the gun, but was wearing no glove on his left hand. Evans pleaded with the defendant to look at her and reminded the defendant that Baines' mother was right there. Nevertheless, the defendant raised his gun and, from a distance of between a few inches to an arm's length, fired one shot into Baines' chest, killing him.

As Baines fell, the defendant began to walk east along West Division Street toward Dixwell Avenue. He stopped briefly, turned back toward where Baines lay on the ground, and pointed the gun toward those standing at the scene. As the defendant continued to walk away, he encountered Walters, who was walking west. The defendant then turned into a vacant lot and fled.

Later that day, Evans identified the defendant from a police photographic array. Three days later, Walters likewise identified the defendant from a photographic array as the man she had seen fleeing the scene of Baines' murder.

The defendant was not seen in the vicinity of West Division Street and Dixwell Avenue after the shooting. He had fled to Elizabeth, New Jersey, where the Connecticut Violent Crimes Fugitive Task Force of the United States Marshal Service (task force) located and arrested him on November 5, 2010. At the time of his arrest, the defendant was wearing a New York Yankees baseball cap with a red underside to its bill and one black glove on his right hand. He was not wearing a glove on his left hand.

During the course of the trial, the state proffered testimony by Officer Steven Manware, a New Haven police officer assigned to the task force, who was charged with the task of locating the defendant following the shooting. Manware testified outside the presence of the jury that the task force uses the Internet to track suspects and will often search social networking websites, including Facebook. During his investigation into the defendant's whereabouts in 2010, Manware found a Facebook profile bearing the defendant's name. At the state's request, in preparation for trial, Manware again accessed the defendant's Facebook page in 2014, and printed a portion of the Facebook profile and several photographs that he found there. Manware testified that the page and the photographs were the same as they appeared in 2010.

Subsequently, the state proffered printouts of a Facebook profile page and three photographs associated

with that profile as exhibits. The defendant objected to the admission of these exhibits, arguing that there was no evidence that he created or maintained the Facebook profile or uploaded the photographs. The trial court overruled the defendant's objection and admitted the exhibits into evidence. Following trial, the jury returned a verdict finding the defendant guilty. The trial court rendered judgment in accordance with the verdict and sentenced the defendant to seventy years of incarceration. This appeal followed. See footnote 1 of this opinion.

On appeal, the defendant claims that the trial court abused its discretion in admitting the exhibits from Facebook. He asserts that: (1) the trial court never found that the defendant created or maintained the Facebook profile page or posted the photographs; (2) the information on the Facebook profile page was generic, easily obtainable and lacked the " 'distinctive characteristics' " required to be authenticated on the basis of circumstantial evidence alone; and (3) the trial court, having improperly relied upon the " 'distinctive characteristics' " method of authentication, never found that the photographs were accurate reflections of the scenes depicted and were not altered. In the defendant's view, because the profile page and the photographs were not properly authenticated, the trial court improperly admitted these exhibits into evidence. The state counters that it adequately authenticated the exhibits because: (1) the state showed that the Facebook profile belonged to the defendant based upon the pervasive consistency of the information and content found on that page that indicated that the defendant owned the page; and (2) the state was not obliged to establish that the defendant created or posted the photographs to his Facebook page, or to present a witness to testify that they were fair and accurate representations of their subject matter, rather, as photographs depicting the identifiable defendant, they were admissible as substantive evidence under the " 'silent witness' " rule of authentication.

Assuming, without deciding, that it was improper for the trial court to admit the evidence, we begin by examining whether its admission was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and

the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 808–809, 51 A.3d 1002 (2012). We note that, in the present case, the defendant makes no claim of constitutional error. For the following reasons, we conclude that, even if this court was to assume that the admission of the questioned exhibits was improper, the ruling was harmless.

The state argues that any impropriety was harmless, and that the case against the defendant was strong, as multiple witnesses testified that they saw the defendant shoot Baines. See, e.g., *State* v. *Eleck*, 314 Conn. 123, 130–31, 100 A.3d 817 (2014) (finding any error in excluding statements found on witness' Facebook page harmless where, inter alia, multiple eyewitnesses testified to defendant's commission of crime); *State* v. *Rodriguez*, 311 Conn. 80, 91–92, 83 A.3d 595 (2014) (any error in admitting testimony harmless where, inter alia, multiple eyewitnesses testified to defendant's involvement in crime and incriminating statements); *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009) (any error harmless where multiple eyewitnesses saw defendant point gun at time of shooting, flee scene, or confess). Evans, Nicholson, and Little each identified the defendant as the shooter. Walters identified the defendant as the man she encountered in immediate flight from the scene of the shooting. Outlaw placed the defendant in the vicinity immediately beforehand and interacting with his "blood brother" Streater who had a motive to seek revenge on Baines. Also, Evans, Nicholson, Little, and Walters each described the peculiar fact that the defendant was wearing only one glove at the time of the shooting, and Evans described the defendant's headwear, including its logo and the red underside of its bill. Manware corroborated all of this testimony when he related how the defendant was sporting a solitary black glove on his right hand and a baseball cap with a red underside to its bill at the time of his arrest. The state presented the glove and baseball cap at trial. The photographs and printout, thus, were merely cumulative of other properly admitted evidence.

The Facebook evidence also was largely innocuous on its face and not particularly important to the state's case. Only one of the exhibits, state's exhibit 50, which depicted the defendant wearing a baseball cap and glove matching the description of the shooter, was in any way directly probative of the charged crimes. The other two photographs were merely foundational evidence for state's exhibit 50. The photographs did not depict the defendant committing a crime, and the state never represented that they even depicted any events

occurring on the day of the shooting.

Moreover, the state presented ample evidence corroborating the Facebook exhibits. See *State* v. *Bonner*, supra, 290 Conn. 501 (any error harmless where "there was ample additional evidence corroborating the challenged . . . testimony, and there was no evidence offered to contradict it"). Multiple witnesses testified that the defendant went by the name of "Donut" and that he lived near the convenience store depicted in one of the photographs. The defendant did not contest these facts at trial. The state also conclusively established that the defendant possessed a baseball cap with a red underside to its bill and a solitary right-handed black glove when Manware testified that the defendant was arrested while wearing items matching that description, both of which the state entered into evidence at trial. Further, the court did not limit the defendant's ability to challenge the Facebook evidence or investigate whether any of it had been digitally altered. See *State* v. *Bonner*, supra, 501 (any error harmless where defendant had "full opportunity to cross-examine" witnesses who presented challenged testimony). Nevertheless, when the defendant cross-examined Manware, he did not elicit any testimony that undermined the credibility of these exhibits. The defendant also did not present any evidence that he undertook forensic analysis of either the photographs or the Facebook profile to determine if they had been digitally altered.

We agree with the state. The defendant has not met his burden of showing that the admission of the evidence had a substantial impact on the jury's verdict. In addition, the state's case was strong. Numerous witnesses identified the defendant as the one who shot Baines. We conclude, therefore, that any error relating to the admission of the evidence challenged by the defendant would have been harmless.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed from the judgment directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] Facebook is "a free, web-based social networking site with over 153 million members in the United States. . . . To join Facebook, a user must provide his or her name, age, gender, and a valid e-mail address, and agree to Facebook's terms of service. . . . Once registered, a member receives a [p]rofile page, may upload a profile photo[graph] representing him or herself, and may establish connections with other members by approving them as Facebook [f]riends." (Citations omitted; internal quotation marks omitted.) *Fraley* v. *Facebook, Inc.*, 830 F. Supp. 2d 785, 791 (N.D. Cal. 2011).